FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 24, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| VINCE B.,[1] | No.    4:20-cv-5168-EFS |
| Plaintiff, | |
| v. | **ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[2] | |
| Defendant. | |

Plaintiff Vince B. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ provided reasonable explanations supported by substantial evidence in assessing Plaintiff's symptom reports and the persuasiveness of the medical sources, the Court grants summary judgment in favor of the Commissioner, denies Plaintiff's motion for summary judgment, and affirms the decision of the ALJ.

---

[1] For privacy reasons, the Court refers to every social security plaintiff by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] On July 9, 2021, Ms. Kijakazi became the Acting Commissioner of Social Security. She is therefore substituted for Andrew Saul as Defendant. Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

1

## I.    Five-Step Disability Determination

2

A five-step sequential evaluation process is used to determine whether an

3

adult claimant is disabled.[3]  Step one assesses whether the claimant is engaged in

4

substantial gainful activity.[4]  If the claimant is engaged in substantial gainful

5

activity, benefits are denied.[5]  If not, the disability evaluation proceeds to step

6

two.[6]

7

Step two assesses whether the claimant has a medically severe impairment

8

or combination of impairments that significantly limit the claimant's physical or

9

mental ability to do basic work activities.[7]  If the claimant does not, benefits are

10

denied.[8]  If the claimant does, the disability evaluation proceeds to step three.[9]

11

Step three compares the claimant's impairment or combination of

12

impairments to several recognized by the Commissioner as so severe as to preclude

13

substantial gainful activity.[10]  If an impairment or combination of impairments

14

meets or equals one of the listed impairments (a "listing"), the claimant is

15

_____

16

[3] 20 C.F.R. §§ 404.1520(a), 416.920(a).

17

[4] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

18

[5] *Id.* §§ 404.1520(b), 416.920(b).

19

[6] *Id.* §§ 404.1520(b), 416.920(b).

20

[7] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

21

[8] *Id.* §§ 404.1520(c), 416.920(c).

22

[9] *Id.* §§ 404.1520(c), 416.920(c).

23

[10] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

conclusively presumed to be disabled.[11]  If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity (RFC).[12]  If the claimant can perform past work, benefits are denied.[13]  If not, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[14]  If so, benefits are denied.  If not, benefits are granted.[15]

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[16]  At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[17]

---

[11] 20 C.F.R. §§ 404.1520(d), 416.920(d).

[12] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[13] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[14] *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497–98 (9th Cir. 1984).

[15] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[16] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[17] *Id.*

1

## II.     Factual and Procedural Summary

2

In August 2017, Plaintiff filed Title II and Title XVI disability applications,

3

alleging his 1992 date of birth as the onset date.[18]  Plaintiff asserted disability

4

based on hearing defects, obsessive compulsive disorder (OCD), anxiety,

5

depression, and mood swings.[19]  Plaintiff's claims were denied initially and upon

6

reconsideration.[20]  Plaintiff then requested an administrative hearing.

7

## A.   The Administrative Hearing & Plaintiff's Testimony

8

In October 2019, Administrative Law Judge Caroline Siderius presided over

9

the requested administrative hearing.[21]  Plaintiff, as well as an impartial

10

psychological expert and an impartial vocational expert, each presented testimony

11

at the hearing.[22]

12

Plaintiff testified that his anxiety causes him to sometimes "freeze up" or

13

shake in the work environment, and he sometimes goes "blank" when people are

14

instructing him, causing him to repeatedly ask questions and need frequent

15

reminders approximately every 15 minutes and to frequently need to redo tasks to

16

fix mistakes.[23]  He further testified that his depression and anxiety caused him to

17

———————————————

18

[18] AR 17, 245.

19

[19] AR 277.

20

[20] AR 17, 80–91, 106–119.

21

[21] AR 17, 35–79.

22

[22] AR 17, 35–79.

23

[23] AR 52–53, 61–63.

miss one day of work per week on average, it caused him to sometimes leave work early, it affected his ability to drive, and it sometimes prevented him from doing things he enjoyed, such as going on family trips.[24]  Plaintiff also testified that when the Department of Vocational Rehabilitation (DVR) placed him at a job with the U.S. Department of Veterans Affairs (VA) involving directing people to the appropriate building location, he lasted only two days because of his anxiety and depression, saying "it was sitting all day and when I sit, my mind starts playing games in my head and, and I start thinking different than I kind of lose track."[25] According to Plaintiff, he informed the DVR team that he needed "a job to do something.  And then that's when they said, well, why don't we stop, wait till SSI, something like that and my immediate reaction was yes . . . I agreed to it 'cause I was nervous."[26]

**B.    The ALJ's Five-Step Findings on Remand**

In denying Plaintiff's disability claims, the ALJ found as follows:

- Insured Status — March 31, 2020, was Plaintiff's date last insured.[27]

- Step One — Plaintiff engaged in substantial gainful activity from July 1, 2016, through September 30, 2016.[28]  "However, there has been a

---

[24] AR 55–57, 61.

[25] AR 58–59.

[26] AR 59–60.

[27] AR 19.

[28] AR 19.

continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity."[29]

- Step Two — Plaintiff had the following medically determinable severe impairments: "major depressive disorder; generalized anxiety disorder; panic disorder without agoraphobia."[30]

- Step Three — Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[31]

- RFC — Plaintiff had the RFC to perform work at all exertional levels but with the following nonexertional limitations:
  - "no more than only ordinary office level noise";
  - "work limited to simple, routine, and repetitive tasks with no detailed work";
  - "only occasional changes to work duties and work setting"; and
  - "work limited to superficial, brief contact with the general public and co-workers."[32]

- Step Four — Plaintiff was unable to perform any past relevant work.[33]

---

[29] AR 20.

[30] AR 20.

[31] AR 20–22.

[32] AR 22.

[33] AR 26.

- Step Five — Considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, including the following representative occupations: hand packager, laundry worker, and collator.[34]

In November 2019, the ALJ issued a written decision finding Plaintiff had not been under a disability, as defined by the Social Security Act ("the Act"), from December 20, 1992, through the date of the ALJ's decision, November 15, 2019.[35] Plaintiff appealed to the Appeal Council, which denied review.[36]  Plaintiff then appealed to this Court, primarily asserting that the ALJ erred by improperly discounting Plaintiff's symptom reports and medical opinions provided by some of his treating providers.[37]

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[38] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[39]  Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable

---

[34] AR 27.

[35] AR 27.

[36] AR 1–2.

[37] *See generally*, ECF No. 19.

[38] 42 U.S.C. § 405(g).

[39] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

1     mind might accept as adequate to support a conclusion."[40]  Because it is the role of

2     the ALJ and not the Court to weigh conflicting evidence, the Court upholds the

3     ALJ's findings "if they are supported by inferences reasonably drawn from the

4     record."[41]  The Court considers the entire record as a whole.[42]

5          Further, the Court may not reverse an ALJ decision due to a harmless

6     error.[43]  An error is harmless "where it is inconsequential to the ultimate

7     nondisability determination."[44]  The party appealing the ALJ's decision generally

8     bears the burden of establishing harm.[45]

9                              **IV.    Analysis**

10          Plaintiff alleges the ALJ erred in (1) finding he engaged in substantial

11    gainful activity at step one, (2) rejecting Plaintiff's OCD and hearing impairments

12    as severe impairments at step two, (3) rejecting Plaintiff's subjective complaints,

13    _____

14    [40] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir.

15    1997)).

16    [41] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

17    [42] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must

18    consider the entire record as a whole, weighing both the evidence that supports and

19    the evidence that detracts from the Commissioner's conclusion," not simply the

20    evidence cited by the ALJ or the parties.) (cleaned up).

21    [43] *Molina*, 674 F.3d at 1111.

22    [44] *Id.* at 1115 (cleaned up).

23    [45] *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

(4) evaluating the medical opinion evidence, and (5) failing to include related limitations in Plaintiff's RFC and the hypothetical posed to the vocational expert.[46] For the reasons discussed below, the Court holds that Plaintiff failed to show the ALJ reversibly erred.  Because the Court affirms the ALJ's determination that Plaintiff did not establish he was at any time disabled under the Act, the Court need not address whether Plaintiff engaged in any substantial gainful activity.

**A.    Step Two: Plaintiff fails to show consequential error.**

At step two of the sequential process, the ALJ must determine whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits his physical or mental ability to do basic work activities.[47]  This involves a two-step process: (1) determining whether the claimant has a medically determinable impairment and (2), if so, determining whether the impairment is severe.[48]

Here, however, the Court need not decide whether the ALJ erred by omitting Plaintiff's hearing impairments and OCD from the list of severe impairments at Step Two.  The ALJ resolved Step Two in Plaintiff's favor based on finding other medically determinable severe impairments.[49]  The ALJ's overall decision shows

---

[46] *See generally*, ECF No. 19.

[47] 20 C.F.R. §§ 404.1520(c), 416.920(c).

[48] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[49] *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (noting that if Step Two is resolved in favor of the claimant, any legal error at that step can only prejudice

that in determining Plaintiff's RFC, she considered all of Plaintiff's impairments as required,[50] and she included limitations in Plaintiff's RFC that were reasonably calculated to address Plaintiff's OCD and hearing impairments.[51]  Plaintiff fails to establish how or why the evidence of record compelled inclusion of any additional work-related functional limitation.  Rather, as discussed further below, the ALJ's assessment of Plaintiff's RFC was reasonable and supported by substantial evidence.

**B.    Symptom Reports: Plaintiff fails to show consequential error.**

In assessing Plaintiff's symptom reports, the ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, "[Plaintiff]'s statements concerning the intensity,

---

the claimant if the omitted impairment would have met a listing at Step Three or if the ALJ failed to include any resulting limitations in crafting the claimant's RFC).

[50] *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e) 416.945; *see also* Social Security Ruling (SSR) 96-8p, 1996 WL 374184.

[51] *See* AR 22 (limiting Plaintiff to "no more than only ordinary office level noise"; "simple, routine, and repetitive tasks with no detailed work and only occasional changes to work duties and work setting"; and "superficial, brief contact with the general public and co-workers"); *cf. also* AR 573 (Jan. 2018: Dr. Bruner noting that although Plaintiff "he has some OCD tendencies that slow him down when it comes to cleaning and organizing," Plaintiff "is able to independently do all activities of daily living.").

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."[52]  As the record does not contain affirmative evidence of malingering, the ALJ was required to provide "specific, clear and convincing" reasons supported by substantial evidence for rejecting Plaintiff's symptom reports after considering the relevant factors.[53]  Plaintiff argues the ALJ failed to provide adequate reasons.[54]  The Court concludes otherwise.

    1. <u>Plaintiff fails to show the ALJ erred in interpreting the DVR records.</u>

    Plaintiff takes issue with how the ALJ construed the DVR records to reveal inconsistencies in Plaintiff's statements and to generally weigh against a disability finding.  According to Plaintiff, "the ALJ relied on the erroneous DVR findings despite overwhelming evidentiary evidence establishing that [Plaintiff] did not receive any services from DVR for a year."[55]

///

//

/

---

[52] AR 23.

[53] *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p, 2016 WL 1119029, at *7; *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

[54] *See* ECF No. 19 at 19.

[55] ECF No. 19.

a.    _The DVR Records & Plaintiff's Reports to DVR Staff_

Plaintiff first applied for DVR services in May 2017.  In July 2017, DVR staff notified Plaintiff that he qualified for services.[56]  After meeting with Plaintiff, conducting an assessment to determine his strengths and vocational interests, and a series of delays, Plaintiff was scheduled for a community based assessment (CBA) so they could finalize his individualized plan for employment.[57]  For Plaintiff's CBA, the contracted Community Rehabilitation Program arranged for Plaintiff to work in a customer service position at the VA medical center starting in December 2017.[58]  The DVR records do not indicate how long Plaintiff worked at the VA, but Plaintiff testified at the administrative hearing that he stopped after only two days.[59]

In January 2018, the Community Rehabilitation Program issued a CBA outcome report.[60]  The outcome report generally indicated that Plaintiff did well in performing his work duties.[61]  Plaintiff drove himself, arrived early, and was well groomed and appropriately dressed.[62]  The report stated Plaintiff appeared to stay

---

[56] AR 342, 370–71.

[57] _See_ AR 338, 341, 436–49.

[58] AR 330.

[59] AR 58–59.

[60] AR 355–57.

[61] _See_ AR 355–57.

[62] AR 356.

on task and work well with others, but he did not do well with following multi-step instructions.[63]  It was noted that Plaintiff "had the willingness to accept supervision . . . but he will need a supervisor that is hands on and willing to break everything down in simple one step directions and check on him often" (suggesting that such check-ins occur hourly).[64]  When prompted to provide recommendations for establishing a work schedule, the report's author wrote, "At this time I cannot provide a recommendation due to [Plaintiff] not knowing if he is going to receive his SSI due to [Plaintiff] stating that if he receives it then he wants to volunteer at the VA."[65]  Similarly, when asked whether Plaintiff could benefit from vocational rehabilitation services, the author stated, "At this time [Plaintiff] is still waiting for the decision on his SSI."[66]

In mid-January 2018, DVR staff noted, "[Plaintiff] reports that he enjoyed working at the VA, he did well and feels comfortable with the work.  He did report that he had some concerns with how others treated the veterans and did not like that part of the job."[67]  DVR staff also wrote, "[Plaintiff] reports that he is worried about finding employment right now as he is awaiting the result of SSI.  [Staff] talked with [Plaintiff] about this and recommended that he talk with social

---

[63] AR 355–56.

[64] AR 355–56.

[65] AR 357.

[66] AR 357.

[67] AR 326.

1    security directly about the impact this may have on his application."[68]  Then, near

2    the end of January 2018, Plaintiff canceled DVR services.  On the associated form,

3    DVR staff stated as follows:

4        [Plaintiff] has decided that he does not wish to pursue
         employment at this time.  He will be awaiting the outcome of his
5        SSI application and then follow up with DVR afterwards,
         depending on the outcome.  VRC talked with [Plaintiff] about
6        closure of his DVR file and both parties agreed that this made
         sense at this point and he would return to DVR at a later date if
7        needed."[69] "

8            b.  *Reasonable Interpretations of the DVR Records*

9            The ALJ reasonably interpreted the DVR reports within the context of the

10   overall record to conclude that Plaintiff's lack of success with DVR services were

11   likely due to his own choices and that the DVR records tended to undermine some

12   of Plaintiff's symptom reports, as well as some of the more-limiting medical

13   opinions.  That is not to say the ALJ's findings were the *only* reasonable

14   conclusions on this record.  For example, one might reasonably interpret the same

15   record as indicating that Plaintiff was confused by DVR statements and

16   suggestions, and he genuinely believed they were recommending that he wait to

17

18   _____

19   [68] AR 326.

20   [69] AR 323–25, 362.  *See also* AR 365 (Jan. 2018 DVR letter to Plaintiff stating,

21   "Your case has been closed effective 01/24/2018 because you are awaiting the

22   outcome of your SSI application and are not ready to pursue competitive

23   employment at this time.").

1    resolve his social-security claim before proceeding with further DVR services.[70]

2    But regardless of alternative reasonable interpretations, the ALJ's findings are

3    still supported by substantial evidence and based on reasonable interpretations

4    thereof.[71]  As such, the Court finds no error.

5            2.  <u>Plaintiff fails to establish consequential error as to his symptom reports.</u>

6            The ALJ reasonably found that the record showed Plaintiff had a higher

7    level of functioning than was consistent with the degree of impairment he

8    alleged.[72]  The ALJ accurately noted that Plaintiff was consistently observed to be

9    able to interact with others without issue.[73]  The ALJ also noted that Plaintiff was

10   able to drive himself places, typically arrived early, and had not reported to his

11   treating psychiatrist any difficulties leaving his home.[74]  An ALJ is permitted to

12

13   ───────────────────────

14   [70] *Cf., e.g.*, AR 612 (Jan. 2018: treatment note stating, "Client and mother are

15   speculating that DVR is waiting until he gets on SSI.").

16   [71] *See Hill*, 698 F.3d at 1158.

17   [72] AR 23.

18   [73] AR 23.

19   [74] AR 24.  Plaintiff did, however, report to his counselor missing out on a family

20   road trip to Seattle, presumably because of his expressed fear of having certain

21   family members drive. *See* AR 609 (Mr. Shepley noting, "We talked about his fear

22   of travel with close family members.  This is very specific to family. . . . He will go

23   further with mother and brother driving than with father.").

discount a claimant's symptom reports based on inconsistencies with reported activities and other evidence regarding his functional capabilities.[75]

The ALJ also reasonably found that some of Plaintiff's testimony was inconsistent with his own prior statements and other evidence of record.[76]  For instance, Plaintiff's testimony regarding his severe fear of driving was inconsistent with the evidence of record showing he drove on a regular basis.[77]  And the ALJ noted that whereas Plaintiff testified to not being able to keep a job because anxiety would cause him to "freeze" and cause shaking, this differs from what he previously reported to other people.[78]  The same is true for his position at the VA;

---

[75] *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); 20 C.F.R. §§ 404.1529(a), 416.929(a).

[76] *See* AR 23–24.

[77] *Compare, e.g.*, AR 67 (Plaintiff testifying, "And it's difficult to me to drive even in town, 'cause I'm thinking I'm going to get a head on."), *with, e.g.*, AR 348 (noting Plaintiff "drives for transportation"); AR 357 (reporting no transportation barriers to employment); AR 698 (Plaintiff reporting feeling "used for transportation" by his friends but that he sold his truck and is now "obsessed" with getting another).

[78] *See* AR 548 (Plaintiff telling his treating physician that he has been unable to keep a job because of problems with ingrown toenails and hearing loss). *Compare also, e.g.*, AR 572–73 (Plaintiff telling Dr. Bruner he quit a car-maintenance job because "a coworker would slap him on the face to remind him that he needed to shave."), *with* AR 301 (Plaintiff stating on his DVR application that he quit the

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 16

whereas Plaintiff testified that he quit because of anxiety,[79] he was observed doing his assigned job well, he reported enjoying the work, and he indicated he quit because he disliked how veterans were treated.[80] An ALJ may discount a claimant's symptom reports on the basis of prior inconsistent statements.[81]

The ALJ reasonably interpreted much of the overall record to be inconsistent with Plaintiff's symptom reports.[82] As such, especially viewing the ALJ's stated reasons in combination, the Court finds the ALJ provided clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's symptom reports.[83]

## C. Persuasiveness Findings: Plaintiff fails to show consequential error.

The parties disagree over whether Ninth Circuit case law continues to be controlling in light of the amended regulations, specifically whether the "clear and

---

same job because it was too fast paced and his "manager said hearing wasn't a disability") *and* AR 57–58 (Plaintiff testifying that he "quit that job 'cause [he] was called names like deaf boy 'cause of [his] hearing.").

[79] AR 69.

[80] *See* AR 326, 357, 612

[81] *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

[82] "[T]he ALJ's interpretation . . . may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not [the Court's] role to second-guess it." *Rollins*, 261 F.3d at 857.

[83] *See Ghanim*, 763 at 1163.

convincing" and "specific and legitimate" standards still apply.[84]  Judges in this District have tended to apply the rationale and holding articulated in *Emilie K. v. Saul*, which held that the ALJ did not err in applying the new regulations over Ninth Circuit precedent, because the result did not contravene the Administrative Procedure Act's requirement that decisions include a statement of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record."[85]  That said, the Court finds that in this case, the Court's conclusions would not differ in any significant respect under the specific-and-legitimate standard.[86]

       1.  <u>Applicable Standard for Persuasiveness Findings</u>

An ALJ need not "give any specific evidentiary weight . . . to any medical opinion(s)."[87]  However, the ALJ does need to consider and evaluate the persuasiveness of all medical opinions of record on a source-level basis.[88]  The factors for evaluating the persuasiveness of medical opinions and prior

---

[84] *See* ECF No. 20 at 11–13; ECF No. 21 at 3.

[85] No. 2:20-cv-00079-SMJ, 2021 WL 864869, *3–4 (E.D. Wash. Mar. 8, 2021), *appeal docketed*, No. 21-35360 (9th Cir. May 10, 2021).

[86] *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (setting forth the specific-and-legitimate standard).

[87] Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68; *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

[88] 20 C.F.R. §§ 404.1520c(a), (b), 416.920c(a), (b).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 18

administrative medical findings include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[89]  Supportability and consistency are the most important factors, and the ALJ is required to explain how both of these factors were considered:[90]

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[91]

Typically, the ALJ may, but is not required to, explain how the other factors were considered.[92]

    2.  Dr. Buitrago: Plaintiff fails to show consequential error.

    The psychological expert, Ricardo Buitrago, PsyD, was the first to testify at the administrative hearing.[93]  Plaintiff asserts that "the ALJ improperly relied on the deficient findings of medical expert, Dr. Ricardo Buitrago, PsyD, as the ALJ

---

[89] 20 C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

[90] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

[91] *Id.* §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

[92] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

[93] AR 686.

1    dismissed him from the hearing prior to the claimant's testimony."[94]   Plaintiff

2    argues that his own testimony established that he has a history of unsuccessful

3    work attempts and employment through job services which provided

4    "accommodations for absenteeism, off-task behaviors, and frequently repeated

5    instructions."[95]   These arguments are unpersuasive, however, as Dr. Buitrago

6    made clear during his testimony that his opinions were based largely on the

7    medical records consistently indicating mild-to-moderate symptoms.[96]

8           a.    _Dr. Buitrago's Testimony & Opinions._

9          Dr. Buitrago reviewed all disability-related records on file, including the

10   medical records and other medical opinions, Plaintiff's symptom reports, and

11   evidence from other sources, such as the letter authored by Plaintiff's mother.[97]

12   Dr. Buitrago expressly considered Listing 12.04 (depressive, bipolar, and related

13   disorders) and Listing 12.06 (anxiety and obsessive-compulsive disorders), and

14   Dr. Buitrago opined that Plaintiff's mental-health symptoms did not meet or equal

15   a listing.[98]

16   _____

17   [94] ECF No. 19 at 16–17.

18   [95] ECF No. 19 at 17.

19   [96] _See, e.g._, AR 47–48 ("I didn't see any record [that] consistently described him as

20   being, you know, seriously markedly impaired in his functioning.  I just didn't.").

21   [97] _See_ AR 42 (Dr. Buitrago testifying that he reviewed exhibits 1E through 20E, or,

22   put another way, AR 273–699).

23   [98] AR 42.

Dr. Buitrago explained that Plaintiff generally reported "moderate levels of anxiety and depressive symptoms."[99]  Dr. Buitrago also noted that the standardized Patient Health Questionnaire (PHQ) and Generalized Anxiety Disorder (GAD) screeners indicated "at most moderate levels of symptom experience."[100]  In examining the "paragraph B criteria," Dr. Buitrago opined that the record supported, at most, moderate limitations in the following categories: (1) understanding, remembering or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself.[101]

Dr. Buitrago opined that Plaintiff would "[do] better with a slower pace environment and simple tasks."[102]  And Dr. Buitrago said this regarding Plaintiff's functional limitations:

> [A]t the very least, the claimant should be able to understand simple instructions.  Should be able to engage in, simple, repetitive tasks independently.  Should be able to maintain attention and concentration for simple tasks.  Should be able to have occasional contact with coworkers, staff, supervisors and the general public.  And should be able to make simple work-related decisions independently.[103]

---

[99] AR 43.

[100] AR 43.

[101] AR 44–45.

[102] AR 43.

[103] AR 44.

Dr. Buitrago concluded that the overall evidence of record did not describe someone "markedly impaired to where he can't function with limitations that [Dr. Buitrago] provided."[104]

### b.    *Dr. Buitrago's Exit Prior to Plaintiff Testifying*

An ALJ may properly credit the opinion of a nonexamining expert who testifies at the hearing and is subject to cross-examination.[105]  Plaintiff cites no authority suggesting that a testifying expert must listen to, or account for, the claimant's testimony.  Nor has Plaintiff shown that his own testimony was at all likely to alter Dr. Buitrago's opinions.  Indeed, when Plaintiff's counsel questioned Dr. Buitrago at the hearing, counsel highlighted a January 2018 psychological consultative examination by Troy Bruner, EdD, in which Plaintiff reported more-severe symptoms and Dr. Bruner noted he "appeared to be a credible historian."[106]  Dr. Buitrago responded by reiterating his reliance on the longitudinal medical evidence, saying, "I'm not doubting his credibility.  I'm going based on the objective medical evidence that I saw."[107]  The Court finds Plaintiff has failed to show that Dr. Buitrago testifying before hearing Plaintiff's testimony amounted to error, much less consequential error.

---

[104] AR 48.

[105] *See Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995).

[106] AR 47.

[107] AR 47.

1

       c.    _The ALJ's Persuasiveness Analysis as to Dr. Buitrago_

2

      In finding Dr. Buitrago's opinions "very persuasive," the ALJ explained they

3

"are consistent with and supported by the longitudinal evidence, including the

4

evidence received at the hearing level."[108]  Importantly, the ALJ cited to specific

5

examples in the record, providing substantial evidence to support this

6

persuasiveness finding.[109]  For instance, the ALJ pointed out that Dr. Buitrago

7

supported his opinions with references to evidence, such as records showing

8

plaintiff was "generally stable," reports regarding the nature and extent of

9

Plaintiff's activities, observations by others of Plaintiff's "demeanor and

10

presentation at job sites and at medical visits."[110]  The ALJ also highlighted that

11

Dr. Buitrago noted Plaintiff had "self-stopped his involvement in [DVR] services

12

pending the outcome of his SSA application for disability benefits, not due to any

13

reason that would prevent him from working."[111]

14

      The ALJ further found that Dr. Buitrago's opinions were more persuasive

15

because "Dr. Buitrago is an expert in SSA-program psychological disability

16

evaluation and is the only clinical psychologist who had the opportunity to review

17

the entire longitudinal records prior to offering his opinions."[112]  Each of the ALJ's

18

---

19

[108] AR 24.

20

[109] _See_ AR 24.

21

[110] AR 24.

22

[111] AR 24.

23

[112] AR 24.

1    stated reasons are reasonable and supported by substantial evidence.[113]  The Court

2    therefore affirms the ALJ's persuasiveness finding as to Dr. Buitrago.

3         3.  Dr. Bruner: Plaintiff shows error, but such error was harmless.

4         Plaintiff takes issue with the ALJ's persuasiveness finding regarding

5    examining psychologist Troy Bruner, EdD.[114]

6              a.    Dr. Bruner's Report & Opinions

7         In January 2018, Dr. Bruner conducted a psychological examination of

8    Plaintiff.[115]  In the resulting report, Dr. Bruner provided several opinions

9    regarding Plaintiff's impairments and resulting limitations.

10        As to concentration, persistence, and pace, Dr. Bruner wrote that Plaintiff

11   "had no difficulty concentrating during the exam."[116]  Dr. Bruner noted, "His

12   thought processes were logical.  His speech was normal for rate, rhythm, and

13   clarity.  There was no evidence of confusion or tangentiality."[117]  Dr. Bruner

14   estimated Plaintiff's level of intelligence to be average to below average.[118]  And, as

15   relevant here, under the discussion/prognosis section of his report, Dr. Bruner

16   wrote,

17   ───────────────────

18   [113] See 20 C.F.R. §§ 404.1520c, 416.920c.

19   [114] See ECF No. 19 at 10–14.

20   [115] AR 571–76.

21   [116] AR 573.

22   [117] AR 573.

23   [118] AR 574.

> He has voiced a desire to be gainfully employed and has been interacting with DVR. However, his attempts to be successfully employed have not come to fruition. His anxiety has interfered with all areas of his functioning and is chronic despite apparent medication compliance and counseling. He appeared to be a credible historian. He appears to be distressed and impaired and psychologically fragile.[119]

Then, under the functional assessment/medical source statement portion of his report, Dr. Bruner provided the following opinions:

> [Plaintiff] would not have difficulty performing simple/repetitive tasks. He would have difficulty performing detailed and complex tasks. He did poorly on delayed recall, abstract thinking, and judgment tasks.
> He would not have difficulty accepting instructions from supervisors.
> . . .
> [Plaintiff] would have difficulty interacting with coworkers and the public due to the belief that he can "freeze" and not function due to anxiety.
> He would not have difficulty performing work activities without special instructions.
> He would have difficulty maintaining a workweek without interruptions from a psychiatric condition. He appeared in distress during the exam. He reported that his anxiety results in irrational, catastrophic thinking.
> [Plaintiff] would have difficulty managing usual stress encountered in the workplace. This is due to his reported history, high levels of impairing anxiety in multiple employment settings. He appears distressed, ruminative, and psychologically fragile. DVR has reportedly not been able to successfully place him."[120]

//

/

---

[119] AR 575.

[120] AR 575–76.

1

                  **b.**   <u>*The ALJ's Persuasiveness Analysis & Error as to Dr. Bruner*</u>

2
       The ALJ provided the following analysis for Dr. Bruner's findings:

3
> Dr. Bruner's opinions are somewhat consistent with and
4
> supported by the longitudinal evidence of record; however,
> Dr. Bruner relied heavily on the claimant's own subjective
5
> report of DVR services, which is inconsistent with the actual
> DVR records showing that [Plaintiff] simply elected to stop
6
> receiving DVR services pending the outcome of his application
> for SSA disability benefits.  However, Dr. Bruner's opinions
7
> regarding superficial contact with the public and supervisors
> and the limitation to simple repetitive jobs are consistent with
8
> and supported by the longitudinal evidence of record, including
> the opinions of Dr. Buitrago.  As such, Dr. Bruner's opinions are
> only somewhat persuasive.[121]

9

10
       Plaintiff argues that the ALJ erred by offering Dr. Bruner's supposed

11
reliance on Plaintiff's "subjective report of DVR services" as the primary

12
justification for finding Dr. Bruner's opinions less persuasive.[122]  The Court agrees.

13
And the following analysis from Ninth Circuit Court of Appeals, with just the

14
names changed, proves the point.

15
> A physician's opinion of disability premised to a large extent
> upon the claimant's own accounts of his symptoms and
16
> limitations may be disregarded where those complaints have
> been properly discounted.
17
> Dr. [Bruner]'s opinion was based in part on [Plaintiff]'s self-
> report that he had trouble keeping a job.  However, Dr. [Bruner]
18
> also conducted a clinical interview and a mental status
> evaluation.  These are objective measures and cannot be
19
> discounted as a "self-report."[123]

20
———————————

21
[121] AR 25 (cleaned up).

22
[122] ECF No. 19 at 12–13.

23
[123] *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (cleaned up).

1    Contrary to the ALJ's assertion, nothing in Dr. Bruner's report suggests that

2    he "relied heavily" on those of Plaintiff's reports relating to DVR services.

3    Dr. Bruner provided several explanations to support his findings, many of which

4    were based on his own observations and/or had nothing to do with reports

5    regarding DVR services.  Further, the ALJ failed to in any meaningful way

6    "explain *how* [she] considered the supportability and consistency factors" while

7    assessing Dr. Bruner's opinions.[124]  The Court therefore holds that the ALJ legally

8    erred.

9              c.    <u>Harmless Error as to the Dr. Bruner Persuasiveness Analysis</u>

10    Despite the ALJ's failure to expressly provide sufficient persuasiveness

11    analysis regarding Dr. Bruner's opinions, Plaintiff fails to show that such error was

12    consequential to the ALJ's ultimate decision.[125]  As a preliminary matter, the ALJ

13    was not merely criticizing Dr. Bruner for relying on Plaintiff's subjective reports

14    when she stated that such reports were "inconsistent with the actual DVR records

15    showing that [Plaintiff] simply elected to stop receiving DVR services pending the

16    outcome of his application for SSA disability benefits."[126]  Rather, by pointing to

17    what she reasonably interpreted as inconsistencies,[127] the ALJ also gave another

18

19    _____

20    [124] *See* 20 C.F.R. §§ 404.1520c(a), (b), 416.920c(a), (b).

21    [125] *See Molina*, 674 F.3d at 1111, 1115.

22    [126] AR 25.

23    [127] *See* AR 575.

reason to doubt Dr. Bruner's assessment that Plaintiff "appeared to be a credible historian."

Perhaps more importantly, when the ALJ's decision is read as a whole, it becomes clear that the ALJ's persuasiveness analysis largely turned on comparing the different medical opinions against each other—and against Dr. Buitrago's opinions in particular.  Though the ALJ did not expressly explain why Dr. Bruner's opinions were only "somewhat consistent" with the longitudinal evidence of record, she did explain how Dr. Buitrago's opinions were *more* consistent; the records she reasonably relied on to show that Dr. Buitrago's opinions were consistent with the overall record can also be reasonably interpreted as inconsistent with the greater limitations opined by Dr. Bruner.[128]

Moreover, as mentioned, the ALJ also found Dr. Buitrago's opinions to be more persuasive because Dr. Buitrago was able to "review the entire longitudinal

---

[128] *See* AR 24–25; *see also, e.g.*, AR 461 (May 2016: Plaintiff and his mother reporting, "No tics. Much less depressed or not at all."); AR 610 (Oct. 2017: Plaintiff reporting working 4–6 hours per day at his parents' house and grandmother's house, and reporting doing well despite frustrations with DVR services); AR 326 (Jan. 2018: DVR staff noting, "[Plaintiff] reports that he enjoyed working at the VA, he did well and feels comfortable with the work."); AR 563 (Dec. 2018: Plaintiff reporting, "The Zoloft if really helping . . . ."); AR 461–699 (PHQ and GAD scores sometimes fluctuating, but generally indicating moderate anxiety and depression).

records prior to offering his opinions."[129]  And Dr. Buitrago was an expert in social

security regulations.[130]  In contrast, Dr. Bruner was unable to review *any* of

Plaintiff's treatment records,[131] and the record contains nothing to suggest that

Dr. Bruner was particularly familiar with social security standards.

Despite the ALJ's failure to strictly adhere to the regulations' requirements

regarding medical-opinion persuasiveness analyses, the ALJ's decision nonetheless

provides sufficient explanation to establish that her finding regarding Dr. Bruner's

opinions being "only somewhat persuasive" were reasonable and supported by

substantial evidence.[132]

4.  <u>Mr. Shepley: Plaintiff fails to show error.</u>

Plaintiff also takes issue with the ALJ's persuasiveness analysis regarding

Licensed Mental Health Counselor Christopher Shepley, MA.[133]  Plaintiff began

seeing Mr. Shepley in May 2017 and generally continued seeing him 2–4 times per

month thereafter.[134]  Plaintiff argues the ALJ erred in rejecting Mr. Shepley's

---

[129] AR 24.

[130] AR 24.

[131] *See* AR 571.

[132] *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988) (requiring the ALJ to

provide sufficient explanation to permit the Court to meaningfully review the

finding).

[133] ECF No. 19 at 14–16.

[134] *See, e.g.*, AR 64.

disabling opinions contained in a September 2019 mental residual functional

capacity assessment.[135]

### a.   *Mr. Shepley's Opinions*

In the assessment, Mr. Shepley opined that Plaintiff was severely limited—

meaning he was completely unable to perform one or more basic work-related

activities—in the following areas:

- "The ability to understand and remember very short and simple instructions."
- "The ability to understand and remember detailed instructions."
- "The ability to work in coordination with or proximity to others without being distracted by them."
- "The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."

Additionally, Mr. Shepley opined that Plaintiff was markedly limited—meaning he

was unable to perform the described mental activity for more than 33% of the

workday—in the following areas:

- The ability to carry out detailed instructions.
- The ability to maintain attention and concentration for extended periods.
- The ability to sustain an ordinary routine without special supervision.
- The ability to accept instruction and respond appropriately to criticism from supervisors.
- The ability to respond appropriately to changes in the work setting.
- The ability to travel in unfamiliar places or use public transportation.
- The ability to set realistic goals or make plans independently of others.

As to the "paragraph B" criteria, Mr. Shepley opined that Plaintiff had an

extreme limitation—meaning he was unable to function independently,

---

[135] *See* AR 690–93.

appropriately, effectively, and on a sustained basis—in the area of "[u]understand, remember, or apply information." And he put Plaintiff at a marked limitation— meaning he was "seriously limited" in functioning independently, appropriately, effectively, and on a sustained basis—in the area of "[a]dapt or manage oneself."[136]

Mr. Shepley opined that Plaintiff would be off-task and unproductive over 30% of the time during a 40-hour workweek.[137] He also indicated that Plaintiff would work four or more days of work per month.[138]

### b. *The ALJ's Persuasiveness Analysis as to Mr. Shepley*

While analyzing the persuasiveness of Mr. Shepley's opinions, the ALJ noted that he had "opined the most restrictive limitations in the entire record."[139] The ALJ remarked that Mr. Shepley had "inconsistently opined that the claimant has 'extreme' limitation in his ability to understand, remember, or apply information, 'marked' limitation in adaptation, 'moderate' limitation in concentration, persistence, or pace, and no limitations whatsoever in social interactions."[140] She further stated,

> Mr. Shepley's opinions are not consistent with or supported by
> the longitudinal evidence of record, including the evidence
> received at the hearing level, the opinions of testifying
> psychological expert, Dr. Buitrago, and Mr. Shepley's own

---

[136] AR 692.

[137] AR 693.

[138] AR 693

[139] AR 25.

[140] AR 25.

treatment notes.  For example, although Mr. Shepley opined that the claimant has "extreme" limitations in his ability to understand, remember, or apply information, Mr. Shepley inconsistently referred the claimant to DVR services, and his DVR services notes indicate absolutely no problems with his ability to understand, remember, or apply information.[141] Further, Mr. Shepley's opinions are internally inconsistent and overestimate the claimant's limitations without support from any objective evidence, which supports the inference that Mr. Shepley relied heavily on the claimant's subjective complaints rather than objective findings when offering his opinions.  Moreover, Mr. Shepley is not an expert in SSA-program psychological disability evaluation and did not have the opportunity to review longitudinal records prior to offering his opinions.  As such, Mr. Shepley's opinions are not persuasive.[142]

Here, as required, the ALJ expressly addressed the consistency and supportability of Mr. Shepley's opinions, and she cited to substantial evidence that

---

[141] Although the ALJ is correct that the DVR records do not show the "extreme" limitations opined by Mr. Shepley in Plaintiff's ability to understand, remember, or apply information, the ALJ's statement that the DVR records "indicate absolutely no problems" in those areas is inaccurate, as those records clearly indicate at least minor problems.  For example, the author of the CBA outcome report noted that Plaintiff "does not do well with following multi-step instructions[;] he does forget and sometimes needs them explained in one step directions.  His mother texted me a few times asking questions due to him being confused."  AR 356.  The author also noted that although Plaintiff "took the map home each night to study[,] he still continued to use the map and ask the other volunteer where an office was in the facility."  AR 356.

[142] AR 25–26 (internal record citations and explanatory parentheticals omitted).

supported her findings.[143]  The ALJ reasonably found Mr. Shepley's opinions were internally inconsistent, were inconsistent with a longitudinal view of the record, and lacked sufficient support.

The Court is cognizant that "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness."[144]  Nonetheless, because Mr. Shepley provided no basis or explanation for his disabling opinions, the ALJ was justified in rejecting them. And Mr. Shepley's treatment notes—despite spanning more than two years—similarly offer little-to-no support for his opinions, as Mr. Shepley tended to merely list, usually broadly, some of the topics he and Plaintiff had discussed that session without providing any observations, analysis, or findings.[145]  Plaintiff therefore fails to show the ALJ erred in finding Mr. Shepley's opinions not persuasive.

---

[143] *See* AR 25–26. *See also* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

[144] *Buck,* 869 F.3d at 1049.  Even if the ALJ's reference to Mr. Shepley basing his opinions on Plaintiff's subjective complaints were deemed error, the Court finds such error would be harmless given the other valid reasons the ALJ provided for finding Mr. Shepley's opinions unpersuasive.

[145] *See, e.g.*, AR 695–99. *Cf. Molina*, 674 F.3d at 1111 (noting an ALJ may permissibly reject check-off reports that do not explain the bases of their conclusions).

**D.    RFC Determination: Plaintiff fails to establish consequential error.**

Plaintiff argues the ALJ failed to properly include all his limitations into the RFC and the hypothetical presented to the vocational expert.[146]  However, this argument depends on Plaintiff's contentions that the ALJ erred in evaluating his symptom reports and the medical opinions described above.  Because there was no consequential error, this final argument necessarily fails.[147]

## V.    CONCLUSION

The Court affirms the decision of the ALJ.  Plaintiff fails to show consequential error, and the ALJ's ultimate decision was based on reasonable findings supported by substantial evidence.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The case caption is to be **AMENDED** consistent with footnote 2.

2.    The decision of the ALJ is **AFFIRMED**.

3.    Plaintiff's Motion for Summary Judgment, **ECF No. 19**, is **DENIED**.

4.    The Commissioner's Motion for Summary Judgment, **ECF No. 20**, is **GRANTED**.

///

//

/

---

[146] ECF No. 19 at 19.

[147] *See Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989) (allowing ALJ to restrict hypothetical to those limitations supported by substantial evidence).

5.      The Clerk's Office shall enter **JUDGMENT** in favor of the Commissioner.

6.      The case shall be **CLOSED**.

**IT IS SO ORDERED.** The Clerk's Office is directed to file this Order and provide copies to all counsel.

**DATED** this 24th day of March 2022.

_s/Edward F. Shea_
EDWARD F. SHEA
Senior United States District Judge
